**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.:

JOSEPH RICHARD, individually and on behalf of all others similarly situated,

Plaintiff,

v.

NEW BELGIUM BREWING COMPANY, INC., d/b/a BELL'S BREWERY,

Defendant.

---

**CLASS ACTION COMPLAINT**

---

Plaintiff Joseph Richard ("Plaintiff" or "Plaintiff Richard"), individually and on behalf of all others similarly situated, brings this action against New Belgium Brewing Company, Inc., d/b/a Bell's Brewery ("Bell's," "Defendant," or "the Company"), and alleges on information and belief, except as to the allegations that pertain to Plaintiff, which are based on personal knowledge, as follows:

## INTRODUCTION

1. Plaintiff brings this consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased Defendant Bell's' beer products (the "Beer") for personal, family, or household use. Defendant failed to disclose the fact that, as shown by testing conducted by Plaintiff and other parties, the Beer contains per- and polyfluoralkyl substances ("PFAS") at levels that the Environmental Protection Agency ("EPA") has found pose a risk to human health.

2. PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies. Consequently, the EPA has outlined a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease.

3. Currently, there is no way to remove PFAS from the body. Therefore, the only way for consumers to prevent the continued accumulation of these dangerous chemicals in their bodies is to avoid exposure to consumer products that contain PFAS, particularly in their diet.

4. As detailed below, the EPA and state regulators have issued guidelines and enforceable limits regarding the levels of PFAS in drinking water that pose health risks. These include limits for specific types of PFAS chemicals, such as PFOA and PFNA.

5. Plaintiff's independent testing conducted in April and July 2026 found that Bell's Beer contained ***525 percent*** of the EPA's enforceable limit for PFOA and ***700 percent*** of the EPA's current enforceable limit for PFNA, while another widely sold beer contained no PFAS.

6. Plaintiff's testing was likely not the first time that Bell's Beer was found to contain levels of PFAS that exceeded the EPA enforceable limit, and the Company was or should have been aware of the presence of excessive PFAS in its Beer. Bell's is the largest and only national brewery in Kalamazoo County, Michigan. In April 2025, a high-profile study conducted by independent researchers found that an undisclosed beer brewed in Kalamazoo County contained levels of PFAS that exceeded the EPA enforceable limit. Despite the broad dissemination of this study's findings in industry press that should have put Defendant on notice that its Beer contained PFAS, Defendant failed to take adequate remedial action or disclose the truth to consumers.

7. Instead, at all relevant times and continuing to the present, Defendant brewed, packaged, marketed, and sold the Beer in a uniform way that failed to disclose the fact that it contains unhealthy levels of PFAS, which only Defendant could and did know.

8. Plaintiff and Class Members could not have known of these harmful levels of PFAS when they purchased the Beer. Like other reasonable consumers, Plaintiff would not have purchased the Beer if Defendant disclosed the fact that it contains unhealthy levels of PFAS, which only Defendant could and did know.

9. Defendant's conduct as alleged herein violates the Colorado Consumer Protection Act ("CCPA"), New York General Business Law § 349 ("GBL"), and amounts to a breach of the implied warranty of merchantability that has resulted in Defendant's unjust enrichment.

## PARTIES

10. Plaintiff Joseph Richard is a natural person and a resident of Brooklyn, New York.

11. Defendant New Belgium Brewing Company, Inc., d/b/a Bell's Brewery, is a Michigan-based brewery founded in 1985 that brews all of its Beer at 8938 Krum Avenue,

Comstock, Michigan 49053. Bell's originally began as an independent brewery, but through a series of business combinations starting in 2021 the Bell's brand became a division of New Belgium Brewing Company, Inc., with a principal address at 500 Linden Street, Fort Collins, Colorado 80524. New Belgium, in turn, is part of the Lion corporate group, which is a subsidiary of Kirin Holdings Company, Limited ("Kirin"), an international beverage company.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists.

13. This Court has personal jurisdiction over Defendant because Defendant resides in this district, and Plaintiff's claims arise out of Defendant's business within the forum.

14. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, and Defendant is subject to the Court's personal jurisdiction.

## FACTUAL ALLEGATIONS

**Bell's Brewery**

15. Bell's Brewery was founded in 1985 by Larry Bell in Kalamazoo, Michigan. Originally known as the "Kalamazoo Brewing Company," in 2002, it began operations at a brewing facility in neighboring Comstock, Michigan, where it has brewed all of its Beer since 2003.

16. By 2018, Bell's had grown into a national craft brewing company and produced over 200,000 barrels of its most popular beer, the Two Hearted IPA, in just that year.[1]

[1] https://porchdrinking.com/articles/2019/02/22/a-forever-flagship-larry-bell-talks-about-two-hearted-and-what-comes-next/ (last accessed Oct. 22, 2026).

17. On November 11, 2021, it was announced that Bell's, which at the time was the seventh largest Brewers Association-defined craft brewery by volume in the United States, was being sold to Lion, an Australian subsidiary of the Japanese conglomerate Kirin.[2] Together with New Belgium Brewing Company, Kirin would "proceed to build a craft platform in North America."[3]

18. Under the terms of the acquisition, which closed for a cash consideration of ¥47.496 billion (approximately $360–370 million), Bell's' 550 employees at the Comstock facility kept their jobs, and the Company would continue its annual production of approximately 500,000 barrels of Beer from the Comstock facility, which at the time was distributed for sale in 43 states.[4]

19. Bell's continued to grow its distribution network from the Comstock facility. On October 2, 2023, Bell's announced that it was sold in all 50 U.S. states, in addition to Puerto Rico and the District of Columbia.[5]

20. All Bell's Beer has been produced at the brewery in Comstock, Michigan, and uses water that comes "from the ground beneath the Kalamazoo area[.]"[6] In 2024, Bell's produced 460,000 barrels of Beer, of which the Two Hearted IPA remained the top product.

21. Upon information and belief, Bell's is the largest brewery located in Kalamazoo County, Michigan, and the only brewery in Kalamazoo County that distributes its beer nationally and internationally.

---

[2] https://www.michiganpublic.org/news/2021-11-11/bells-brewery-maker-of-two-hearted-and-oberon-ales-sold-to-international-conglomerate (last accessed Oct. 22, 2026).

[3] Kirin Holdings Company, Limited, Annual Securities Report for the 184th fiscal year, https://pdf.irpocket.com/C2503/xivA/JYkK/EjIJ.pdf.

[4] https://www.brewbound.com/news/bells-brewery-to-sell-to-new-belgium-parent-co-lion-larry-bell-to-retire/

[5] https://bellsbeer.com/culture/our-beer-is-now-distributed-in-all-50-u-s-states-%F0%9F%8E%89%F0%9F%87%BA%F0%9F%87%B8/ (last accessed Oct. 22, 2026).

[6] https://bellsbeer.com/culture/5-facts-about-bells-beer-and-clean-water/ (last accessed Oct. 22, 2026).

**PFAS in Bell's Beer**

**The Health Risks of PFAS in Consumer Products**

22. PFAS are a category of highly persistent and harmful man-made chemicals, which include perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); and perfluorohexanesulfonic acid ("PFHxS").[7]

23. PFOS in particular is well-known to have severe and negative impacts on human health and the environment. Given the adverse effects of PFOS on the body and environment, it is one of the most commonly studied and regulated types of PFAS.[8]

24. PFAS are a source of consumer concern, due to various widespread environmental presence, bio-accumulative properties, extreme persistence, and strong evidence of myriad adverse health effects.[9]

25. As a result, there has been an international effort in the scientific, regulatory, and industrial communities to cease the production and uses of PFAS, including in food and beverage products.[10]

26. Critically, PFOS and PFOA have been phased out of production since the early 2000s and are prohibited from manufacturing and most consumer uses in European Union countries since 2008 (Directive 2006/122/EC).[11]

---

[7] https://www.epa.gov/pfas/pfas-explained (last accessed Aug. 4, 2026).

[8] *See* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last accessed Aug. 4, 2026).

[9] Raveena Dhore, Ganti S. Murthy, Per/polyfluoroalkyl substances production, applications and environmental impacts, (Dec. 2021), https://www.sciencedirect.com/science/article/abs/pii/S0960852421011494.

[10] Nicole Marie Brennan, et al., Trends in the Regulation of Per- and Polyfluoroalkyl Substances (PFAS): A Scoping Review, (Oct. 17, 2021), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8536021/.

[11] *See* https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32006L0122 (last accessed Aug. 4, 2026).

27. Diet is one of the major sources of human PFAS exposure, and accordingly reasonable consumers purchasing any beverage product would not expect it to contain harmful man-made chemicals, such as PFAS.[12]

28. The Environmental Protection Agency ("EPA") has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS [which the EPA defines through a number of rules] may lead to:"[13]

a. Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

b. Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

c. Increased risk of some cancers, including prostate, kidney, and testicular cancers.

d. Reduced ability of the body's immune system to fight infections, including

e. Interference with the body's natural hormones.

f. Increased cholesterol levels and/or risk of obesity.

29. A figure from the European Environmental Agency ("EEA") depicts the "[e]ffects of PFAS on human health:"[14]

---

[12] Herbert P. Susmann, et al., "Dietary Habits Relate to Food Packaging and Population Exposure to PFASs," (Oct. 9, 2019), https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092.

[13] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last accessed Aug. 4, 2026).

[14] *See* https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe (last accessed Aug. 4, 2026).




30. The EPA has stated that limiting exposure to PFAS, including by reducing the consumption of beverages that contain it, can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[15]

31. There is currently no procedure, treatment, or remedial measure to remove PFAS from the body once it has been consumed, and individual PFAS chemicals have a half-life that is longer than human life expectancy. Because PFAS accumulates in body tissues over time and does not break down organically within a human lifetime, the best way for people to keep PFAS from accumulating within their bodies is to refrain from consuming products that contain it.[16]

---

[15] *See* https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk (last accessed Aug. 4, 2026).

[16] *See* https://www.atsdr.cdc.gov/pfas/prevent-exposure/index.html (last accessed Nov. 4, 2026).

**Regulators and Consumers Are Focused on PFAS in Consumer Products**

32. The EPA and state regulators have found that PFOA exposure has negative effects on the immune system, the cardiovascular system, the reproductive system, and increases the risk of cancer, and adopted policies accordingly.

33. Indeed, the EPA recently finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for drinking water, which are defined as the "level of a contaminant in drinking water below which there is no known or expected risk to health."

34. The EPA set the MCLG for both PFOA and PFOS at zero, meaning that any amount of PFOA or PFOS in drinking water is known to pose a risk to human health.[17]

35. For other categories of PFAS, exposure to even trace amounts can pose substantial risk to health. For instance, the EPA's recent MCLG's were set for 10 ppt for PFNA.[18]

36. In other words, according to the EPA, there is no "safe" level of exposure to these chemicals, and even "trace" levels of PFAS can pose substantial risk to human health.

37. The same rules promulgated by the EPA also established legally enforceable levels, called Maximum Contaminant Levels (MCLs) for drinking water which are defined as the "highest level of a contaminant that is allowed in drinking water[,]" and "are set as close to MCLGs as feasible using the best available treatment technology and taking cost into consideration."[19]

38. The MCL for PFOA is 4 ppt.[20]

39. For PFNA, the MCL is currently 10 ppt, and the new rules propose rescinding the enforceability of the rule for procedural, not substantive reasons: "The EPA's proposal is necessary to correct the unlawful procedure under which regulations for these PFAS were promulgated. The

[17] 40 C.F.R. § 141.50.

[18] *Id.*

[19] https://www.epa.gov/sdwa/drinking-water-health-advisories-has.

[20] 40 C.F.R. § 141.61.

EPA's proposal is solely based on a need to correct this unlawful process. . . . While the EPA cannot pre-determine the outcome, it is possible that the result could be more stringent requirements."[21]

40. In addition to the EPA, the states of Illinois, Maine, Vermont, and Oregon have codified on a state level the EPA's current MCLs for drinking water of 4 ppt for PFOA and 10 ppt. New Jersey has adopted MCLs for 14 ppt for PFOA and 13 ppt for PFNA. Michigan has adopted an MCL of 8 ppt of PFOA and 6 ppt for PFNA. Massachusetts has adopted an enforceable standard for various PFAS including PFOA and PFNA that limits total amounts to 20 ppt in total across separate PFAS chemicals.

41. Other regulatory bodies have pursued other strategies to mitigate the recognized risk of consumer exposure to PFAS aside from enforceable standards, including through disclosure or mandatory regulatory reporting. For instance, the California Office of Environmental Health Hazard Assessment (OEHHA) requires disclosure of any amount of both PFNA and PFOA.[22]

42. In addition to federal and state regulatory bodies, the public has become increasingly aware of the health risks posed by chemicals in consumer products in general and PFAS specifically. For instance, a study conducted by Pew Research Center released on February 26, 2026, titled "Americans Are Concerned About Harmful Chemicals in Food, Water and Everyday Products" found that "[m]ore than 70% of adults in the United States are very or somewhat concerned about their own or their loved ones' exposure to harmful chemicals in food and drinking water." The same study found that "5 in 6 want government and business to do more to ensure chemical safety and increase transparency around the use of chemicals."[23]

---

[21] https://www.epa.gov/sdwa/proposed-pfas-rescission-rule (last accessed Oct. 21, 2026).

[22] https://oehha.ca.gov/proposition-65/proposition-65-list (last accessed Oct. 21, 2026).

[23] Americans Are Concerned About Harmful Chemicals in Food, Water and Everyday Products | The Pew Charitable Trusts (last accessed Oct. 21, 2026).

43. Another study released in PLOS One on November 16, 2023, titled “Let’s talk about PFAS: Inconsistent public awareness about PFAS and its sources in the United States” found that 34.8% of subjects reported “being very or extremely concerned about PFAS in their drinking water,” while another 18.9% “had already changed their drinking-water use.”[24]

**The Known Risk of PFAS in Bell’s Beer**

44. The risk of water contamination in general, and of PFAS in particular, has been known to Bell’s for at least a decade before Plaintiff’s testing was conducted. Indeed, in an article in the trade publication “All About Beer” titled “Conserving Water: The Fight to Protect Beer’s Main Ingredient,” Larry Bell described the existential risk that water contamination in the Kalamazoo River posed to Bell’s Brewery stating, “For all the challenges I’ve had in my business career, I’ve never had one that I was afraid could put me out of business,” said Mr. Bell. “This terrifies me that they could actually contaminate my brewery.” Mr. Bell further pointed to the extreme importance of water safety stating, “I think this could very well be our next great issue for brewers,” Mr. Bell said. “Because if we don’t have clean water to make our beer, we’re out of business.”[25]

45. Mr. Bell’s water safety advocacy continued, and he identified the specific risk of PFAS to the brewing industry as early as September 2018. In an op-ed published in The Detroit News on September 19, 2018, titled “Michigan does not need Line 5,” Mr. Bell wrote, “As a brewer of high quality beers, the integrity of our ingredients is of utmost importance to Bell's Brewery, Inc… As a result of the massive 2010 Kalamazoo River oil spill, the Flint water

[24] T. Allen Berthold, Audrey McCrary, Stephanie deVilleneuve, Michael Schramm, “Let’s talk about PFAS: Inconsistent public awareness about PFAS and its sources in the United States.” PLOS ONE, Nov. 2023 https://journals.plos.org/plosone/article?id=10.1371%2Fjournal.pone.0294134& (last accessed Oct. 21, 2026).

[25] https://allaboutbeer.com/article/brewers-for-clean-water/ (last accessed Oct. 21, 2026).

contamination tragedy ***and the recent spate of PFAs contamination around the state,*** Michigan has been gaining a reputation for having bad water."[26] (Emphasis added.)

46. Mr. Bell continued to highlight the risk that PFAS in the Michigan water supply posed to the brewing industry in the state's popular press. In an article titled "'No Water, No Beer'" published in Encore, a news magazine based in Kalamazoo, Michigan, on August 1, 2020, Mr. Bell again identified the risk to the brewing industry posed by PFAS stating: ***"Between the PFAS,*** Flint, the oil spill here in the Kalamazoo River and Line 5 in the Straits of Mackinac, we are putting Michigan water in the spotlight for the wrong reasons." (Emphasis added.)

47. On July 29, 2021, just months before the Company was sold to Lion, Mr. Bell published an article in Crain's Detroit Business titled, "You can't brew good beer without good water," in which he highlighted his role as co-chair of the Great Lakes Business Network and commitment to "water infrastructure issues and making the necessary improvements to ensure pollution, especially plastic pollution, doesn't reach our waterways."[27] Mr. Bell detailed the efforts undertaken by Bell's Brewery and others to address plastic pollution, but did not mention any efforts to remedy the already-recognized risk of PFAS to the Beer.

**The April 2025 Study of PFAS in Beer**

48. On April 24, 2025, a study (the "April 2025 Study") titled "Hold My Beer: The Linkage between Municipal Water and Brewing Location on PFAS in Popular Beverages" was published by scientists affiliated with the research firm RTI International in the peer-reviewed scientific journal sponsored by the American Chemical Society, "Environmental Science & Technology."[28]

---

[26] https://www.detroitnews.com/story/opinion/2018/09/19/michigan-does-not-need-line-5/1347289002/

[27] https://www.crainsdetroit.com/crains-forum/larry-bell-you-cant-brew-good-beer-without-good-water/ (last accessed Oct. 22, 2026).

[28] Hoponick Redmon J., De Luca N. M., Thorp E., Liyanapatirana C., Allen L., Kondash A. J., "Hold My Beer: The Linkage between Municipal Water and Brewing Location on PFAS in Popular Beverages."

49. The April 2025 Study applied Method 533, a generally accepted laboratory test procedure used to measure PFAS in drinking water, to test 23 beers for 17 targeted PFAS, and was the first study "to adapt EPA Method 533 to measure PFAS in beer from various regions, brewery types, and water sources."[29]

50. The April 2025 Study selected the 23 beers based on four criteria, and each beer was selected based on one of four criteria. Criteria 1 and 2 beers were selected because they were brewed in regions with PFAS in municipal drinking water and thus were targeted for the study to understand if there was an association between PFAS in tap water and beer. Criteria 3 and 4 beers were selected because they were popular beers domestically and internationally, respectively.

51. The April 2025 Study designated the selected beers anonymously by county and state in which each product was brewed and did not disclose which beers had been sampled.

52. In accordance with standard reporting procedures, the April 2025 Study reported both a method detection limit ("MDL") and a method reporting limit ("MRL").

53. The MDL is the lowest concentration of a substance that can be measured and reported with 99% confidence that the concentration is greater than zero. The MRL is a higher, practical limit where the laboratory can accurately and quantitatively measure the chemical in a real sample.

54. Of the Criteria 1 and 2 beers, which were all brewed in North Carolina, Michigan and California in areas that had high levels of PFAS in public water sources, 12 of the 15 sampled beers had PFAS above the MRL.

---

ENVIRON. SCI. TECHNOL. 2025;59(17):8368–8379. https://pubs.acs.org/esthag/article-pdf/59/17/8368/40979249/es4c11265.pdf (last accessed Aug 4, 2026).

[29] *Id.*

55. Of the Criteria 3 and 4 beers, which were popular domestic and international products, one of the five popular national beers and one of three international beers contained detectable PFAS above the MRL.

56. In particular, Beer 1 for Criteria 2 was brewed in Kalamazoo County, Michigan, where Bell's is the largest brewery and the only one that distributes its Beer nationally.

57. The April 2025 Study consisted of five replicate PFAS measurements, which were each reported and then averaged. Throughout the five replicates, Beer 1 for Criteria 2 was found to contain between 4.069 and 8.374 ppt of PFOA, with a mean through the phases of the study of 6.618 ppt of PFOA.

58. All replicates found that Beer 1 for Criteria 2 exceeded the MCLG for PFOA, which is 0 ppt. All replicates found that it exceeded the MCL, which is 4 ppt, and on average the replicates found that it was just 165% of the EPA's enforceable limit for PFOA in drinking water.

59. Throughout the five replicates, Beer 1 for Criteria 2 was also found to contain between 0.780 and 1.255 ppt of PFOS.

60. The findings of the April 2025 Study were widely disseminated within the scientific community, the brewing industry and the public. On May 21, 2025, the American Chemical Society released a statement announcing the findings, and called on "greater awareness among brewers, consumers and regulators to limit overall PFAS exposure."[30]

61. The April 2025 Study was also the subject of commentary within the brewing industry. For instance, on May 13, 2025, the Brewers Association reviewed the study and issued a commentary on its website complete with recommendations for how breweries could minimize PFAS in their beer stating, "Common filtration methods used in breweries can, when systems are well maintained, help minimize PFAS contamination. Reverse osmosis and activated carbon

[30] https://www.acs.org/pressroom/presspacs/2025/may/research-reveals-forever-chemicals-present-in-beer.html (last accessed Aug. 6, 2026).

filtration have been shown to be somewhat effective in removing longer-chain PFAS compounds."[31]

62. Months later, on September 4, 2025, Food & Wine released an article titled "Your Beer May Contain 'Forever Chemicals,' According to New Research." The article restated the study's findings of PFAS at material levels, and that "beer brewers could take responsibility for identifying and removing those sources to reduce the problem."[32]

**Plaintiff's Testing of Bell's Beer**

63. After the release of the April 2025 Study, Plaintiff became concerned that the anonymous Beer 1 for Criteria 2, brewed in Kalamazoo County, Michigan, was Bell's, and arranged for a qualified laboratory to test Bell's Beer in April 2026.

64. The qualified laboratory, based in Bend, Oregon, conducted testing on Bell's Two Hearted IPA pursuant to generally accepted methods that adapted EPA Method 533, which is used to test water sources for PFAS, to test the Beer.

65. Under Method 533, the EPA reports that "Compliance with MCLs is determined by running annual averages at the sampling point."[33] Accordingly, to determine whether a water system is in compliance with its MCLs, the EPA calculates the average findings of its various samples to be reported as the level of a given chemical for that water system.

66. Plaintiff's testing included four samples of Bell's Two Hearted IPA, which were purchased from retail stores across the United States, and one sample of Modelo Especial.

67. The first sample, tested in April 2026, was of a tallboy can (i.e., 16 fluid ounces) of Bell's Two Hearted IPA purchased in Eugene, Oregon. The first sample contained 127 ppt of PFNA, ***1270 percent*** of the current limit established by EPA.

---

[31] https://www.brewersassociation.org/association-news/pfas-compounds-found-in-beer/ (last accessed Aug. 6, 2026).

[32] https://www.foodandwine.com/beer-pfas-forever-chemicals-11801557 (last accessed Aug. 6, 2026).

[33] https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed October 21, 2026).

68. The second sample, tested in June 2026, was of a tallboy can of Bell's Two Hearted IPA purchased in Green Bay, Wisconsin. The second sample contained 47 ppt of PFOA, ***11.75 times*** the limit established by the EPA. It also contained 80 ppt of PFNA, which is ***800 percent*** of the current limit established by the EPA.

69. The third sample, tested in June 2026, was of a bottle of Bell's Two Hearted IPA purchased in Green Bay, Wisconsin. The third sample contained 37 ppt of PFOA, ***925 percent*** of the limit established by the EPA. It also contained 72 ppt of PFNA, which is ***720 percent*** of the current limit established by the EPA.

70. Pursuant to the methodology of reporting adopted by the EPA in Method 533, Plaintiff's testing found a running annual average of 21 ppt of PFOA, which is ***525 percent*** of limit established by the EPA.

71. Plaintiff's testing found PFOA at levels drastically above the MCLs of Maine, Vermont, Oregon, Massachusetts, New Jersey, Illinois and Michigan.

72. Plaintiff's testing found a running annual average of 69.75 ppt of PFNA, which is almost ***700 percent*** of the current limit established by the EPA.

73. Plaintiff's testing found PFNA at levels drastically above the MCLs of Maine, Vermont, Oregon, Massachusetts, New Jersey, Illinois and Michigan.

74. Plaintiff also tested one sample of Modelo Especial as a control subject to compare with Bell's in September 2026. Unlike the samples of Bell's, the Modelo Especial ***did not contain any*** PFAS chemicals regulated by the EPA.

**Plaintiff's Experience with Bell's**

75. Plaintiff is a citizen and resident of the state of New York. During the applicable statute of limitations period, on a regular basis, Plaintiff purchased and consumed Bell's Beer that contained PFAS. More specifically, during the class period, Plaintiff, a food and beverage

enthusiast and social beer drinker, purchased the Beer on a regular basis at grocery stores in Brooklyn, New York. Plaintiff is a consumer of Defendant's goods.

76. Prior to each of his routine purchases, Plaintiff reasonably believed that the Beer did not pose risks to human health if the consumer abided by responsible drinking practices, and like the Modelo Especial product tested, was free of harmful, man-made chemicals like PFAS.

77. He would not have purchased the Beer over its non-contaminated competitors, on the terms he did or any other, if the true facts regarding the health risks it posed due to the presence of PFAS, which Defendant had actual knowledge of but failed to disclose to him.

78. As a direct result of Defendant's failure to disclose these material facts, Plaintiff suffered and continues to suffer, economic injuries because he routinely purchased a Beer that contained PFAS at levels found by the EPA to pose a risk to health, which he would not have otherwise purchased.

79. Plaintiff has an affection and fondness for Bell's Beer as an iconic brand associated with positive memories. He continues to desire to purchase it from Defendant if he can rely on that Beer to be free from PFAS, which are known to pose a risk to human health.

80. However, concerned about the health consequences of PFAS and Defendant's failure to disclose material facts as detailed herein, Plaintiff is unable to determine if Defendant's Beer is actually free of harmful chemicals like PFAS in the future. Plaintiff understands that the composition of the Product may change over time, but as long as Defendant may impliedly warranty that the Beer does not levels of PFAS found by the EPA to pose a risk to health, when it actually does, he will be unable to make informed decisions about whether to purchase Defendant's Beer.

## CLASS ACTION ALLEGATIONS

81. Plaintiff Richard brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action may be properly maintained as a class

action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

82. Plaintiff Richard seeks to represent a class of all consumers in the United States who purchased Bell's Beer within the relevant statute of limitations (the "Class").

83. Plaintiff Richard also seeks to represent a subclass of New York consumers who purchased Bell's Beer within the relevant statute of limitations ("the New York Subclass" or "the Subclass").

84. Upon completion of discovery with respect to scope of the Class and Subclass, Plaintiff Richard reserves the right to amend the class definition. Excluded from the Class are Defendant, its direct parents, subsidiaries and affiliates, and their directors and officers.

85. While the exact number of members cannot be determined, the Class and Subclass consist of, at a minimum, thousands of persons. The members of the Class and Subclass are therefore so numerous that joinder of all members is impracticable. The precise number of Class and Subclass members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

86. There are common questions of law and fact exist as to all members of the Class and Subclass, and predominate over any questions affecting only individual members, including but not limited to:

a. whether Defendant concealed, omitted, or failed to adequately disclose that their Beer contained levels of PFAS found by the EPA to pose a risk to health;

b. whether Defendant failed to adequately implement measures to produce, distribute and sell their Beer in such a way that complied with all warranties to consumers;

c. whether Defendant's conduct violated the laws cited in the causes of action herein;

d. whether Defendant was unjustly enriched by its conduct as alleged herein;

e. whether Defendant's conduct damaged members of the Class and, if so, the measure of those damages; and

f. whether all members of the Class are entitled to seek equitable and/or injunctive relief from Defendant, and if so, the measure and form of such relief.

87. Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class Members have sustained damages arising out of Bell's' common course of conduct as alleged herein.

88. Plaintiff will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff is committed to pursuing this action and has retained competent counsel experienced in litigation of this type, and class action litigation in particular. Plaintiff has no interests antagonistic to those of other Class Members.

89. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class and Subclass members to seek redress for the wrongful conduct alleged. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case a class action.

## CAUSES OF ACTION

## COUNT I

**Violations of the Colorado Consumer Protection Act**

**Colo. Rev. Stat. §§6-1-101 *et seq*.**

*On behalf of Plaintiff and the Class*

90. Plaintiff hereby incorporates by reference all allegations made in the previous paragraphs.

91. Bell's is a "person" as defined in the Colorado Consumer Protection Act ("CCPA"). Colo. Rev. Stat. § 6-1-102(6).

92. Colo. Rev. Stat. § 6-1-105 states in pertinent part:

> (1) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:
>
> * * *
>
> > (l) Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;
>
> * * *
>
> > (u) Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction
>
> * * *
>
> (3) The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state.

93. As alleged herein and above, Bell's has engaged in a deceptive trade practice by conveying and implying the Beer to be of a quality, safety and merchantability that was not true.

Indeed, Defendant knew that its Beer contained levels of PFAS found by the EPA to pose a risk to health but failed to disclose this information from Plaintiff and Class Members.

94. Per the EPA, the Beer poses risks to human health if consumed and therefore is of an inferior quality and trustworthiness compared to other products in the industry that do not contain such levels of PFAS. As detailed above, Defendant further violated the CLRA when it conveyed and implied that the Beer meets a certain standard or quality that reasonable consumers would expect.

95. Specifically, Defendant marketed the Beer while failing to disclose information regarding its levels of PFAS, and no reasonable consumer would knowingly purchase over competitors that do not pose such a risk.

96. Defendant's deceptive practice to fail to disclose material facts regarding the levels of PFAS in the Beer was designed with the intention to induce Plaintiff and Class Members to purchase or otherwise acquire the Beer instead of other beers that do not such levels of PFAS that the EPA to pose a risk to health.

97. Defendant had actual knowledge that the Beer contained levels of PFAS found by the EPA to pose a risk to health to consumers because (1) Bell's' founder and former CEO engaged in a public advocacy campaign and made public statements regarding the risk of PFAS contamination in the period immediately preceding the sale of the Company to Lion, evincing that the risk of PFAS was known, and (2) Bell's knew that its Beer was likely the subject of the April 2025 Study.

98. Upon recognizing that (1) the Company knew of the risk that PFAS posed to its Beer immediately before the sale to Lion, and (2) a widely disseminated study identified a

Kalamazoo County beer, the county in which Bell's is the largest and only national brewery, as a subject that contained PFAS, it is implausible that Defendant did not conduct its own testing of the Beer. This testing which would have put Defendant on notice of the Beer contained levels of PFAS at levels that the EPA has found pose a risk to human health, whereas other beers manufactured by the Company's competitors do not. Alternatively, if Defendant did not perform appropriate tests, it was reckless in failing to do so.

99. Plaintiff and the other members of the Class have been and continue to be injured as a direct and proximate result of Bell's' violations of the CCPA.

100. Plaintiff is thereby entitled to pursue a claim on behalf of the Class against Bell's under Colo. Rev. Stat. § 6-1-113 for equitable relief to remedy Bell's violations of the CCPA.

**COUNT II**

**Breach of Implied Warranty**

*On Behalf of Plaintiff and the Class*

101. Plaintiff hereby incorporates by reference all allegations made in Paragraphs 1 through 89.

102. Under C.R.S. 4-2-314, a warranty of merchantability is implied in the sale of goods by a merchant who deals in goods of that kind. In particular, goods must be fit for the ordinary purposes for which such goods are used.

103. Defendant implied that the Beer was merchantable in that it would: (a) pass without objection in the trade or industry under the contract description, and (b) was fit for the ordinary purposes for which the Beer is used. Defendant breached these implied warranties because the Beer contained levels of PFAS found by the EPA to pose a risk to health. Therefore, the Beer would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

104. Plaintiff and Class Members purchased the Beer in reliance upon Defendant's skill and judgment in properly producing, distributing, packaging and labeling the Beer.

105. The Beer was not altered by Plaintiff or Class Members.

106. The Beer was defective at the time of sale. The danger as described in this Complaint was latent in the Beer and not discoverable at the time of sale.

107. Defendant knew the Beer would be purchased and used without additional testing by Plaintiff and Class Members, and that it was the only party to the transaction that could know of the defective nature of the Beer.

108. As a direct and proximate cause of Defendant's breach of the implied warranty,

109. Plaintiff and Class Members have been injured and harmed because they would not have purchased the Beer if they knew the truth about the Product, namely, that it was unfit for consumption and according to the EPA, posed health risks.

**COUNT III**

**Violation of New York General Business Law § 349**

*On Behalf of the New York Subclass*

110. Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 1 through 89.

111. Plaintiff brings this claim individually and on behalf of the members of the New York Subclass against Defendants.

112. New York General Business Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

113. Defendant's failure to disclose material facts concerning the Beer was directed to consumers and were consumer-oriented. Defendant marketed, advertised, promoted, and sold the Products to the general public, including consumers in New York.

114. As alleged herein, Defendants engaged in deceptive acts and practices within the meaning of New York General Business Law § 349 by implying the Beer to be of a quality, safety and merchantability that was not true. Indeed, Defendant knew that its Beer contained levels of PFAS found by the EPA to pose a risk to health but failed to disclose this information to Plaintiff and Class Members.

115. Defendant's deceptive practice of failing to disclose material facts regarding the levels of PFAS in the Beer to consumers was designed with the intention to induce Plaintiff and Class Members to purchase or otherwise acquire the Beer.

116. Defendant had actual knowledge that the Beer contained levels of PFAS found by the EPA to pose a risk to health to consumers because (1) Bell's' founder and former CEO engaged in a public advocacy campaign and made public statements regarding the risk of PFAS contamination in the period immediately preceding the sale of the Company to Lion, evincing that the risk of PFAS was known, and (2) Bell's knew that its Beer was likely the subject of the April 2025 Study.

117. Plaintiff and members of the New York Subclass reasonably relied on Defendants' deceptive marketing, *i.e.*, Defendant's failure to disclose the fact that the Beer contained levels of PFAS above what the EPA considers to be a health risk, when purchasing the Beer over its competitors.

118. As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff and members of the New York Subclass suffered injury and damages because they purchased Beer that they would not have purchased but for Defendant's deceptive conduct on the terms they did or any other.

119. Plaintiff and the New York Subclass are entitled to recover their actual damages, statutory damages, injunctive relief, attorneys' fees, costs, and all other relief available pursuant to New York General Business Law § 349.

## **COUNT IV**

### **Unjust Enrichment**

*On Behalf of Plaintiff and the Class*

120. Plaintiff hereby incorporates by reference all allegations made in Paragraphs 1 through 89.

121. Through the conduct alleged herein, Bell's received and retained tangible benefits at the expense of Plaintiff and Class members, including by collecting payment for the Beer that they would not have been able to collect had they disclosed the material fact that the Beer contained levels of PFAS found by the EPA to pose a risk to human health.

122. Under the principles of public policy and equity, Defendant should not be permitted to retain the revenue it acquired through its unlawful conduct, *i.e.*, its sale of the Beer and failure to disclose that it contained levels of PFAS found by the EPA to pose a risk to health to consumers who would not have otherwise purchased it. All money, assets, and benefits that Bell's has unjustly received because of their actions rightfully belong to the Class.

123. To remedy Defendant's unjust enrichment at the expense of Plaintiff and the Class, the Court should order Defendant to immediately return Plaintiff's and Class Members' payments made as a result of Defendant's illicit conduct, and disgorge any amounts received by Defendant resulting therefrom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief, together or in the alternative:

a. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

b. Appoint Plaintiff's Counsel as representative of the Class, and designate the undersigned as Class Counsel;

c. Declare Defendant's conduct unlawful;

d. Enjoin Defendant from continuing the unlawful conduct alleged herein;

e. Award Plaintiff and the Class damages under common law and/or by statute, including punitive damages;

f. Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

g. Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

h. Grant such other equitable relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff and Class Members demand a trial by jury on all triable issues.

Dated: November 4, 2026

Respectfully submitted,

/s/*Matthew Insley-Pruitt*

Matthew Insley Pruitt
Carl L. Stine (*application for admission pending*)
Samuel Coffin (*application for admission pending*)
**WOLF POPPER LLP**
570 Lexington Ave.
New York, NY 10022
Telephone: (212) 759-4600
Email: minsley-pruitt@wolfpopper.com
cstine@wolfpopper.com
scoffin@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*